UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:19-CV-81043-ROSENBERG/REINHART

FLORIDA POWER & LIGHT COMPANY,

    Plaintiff,

v.

BELLSOUTH TELECOMMUNICATIONS,
LLC d/b/a AT&T FLORIDA,

    Defendant.
_____/

**ORDER ADOPTING IN PART MAGISTRATE'S
REPORT AND RECOMMENDATION, GRANTING IN PART AND
DENYING IN PART DEFENDANT'S MOTION TO DISMISS, AND STAYING CASE**

This matter is before the Court upon Defendant's Motion to Dismiss or, in the Alternative, Stay. DE 4. This matter was referred to Magistrate Judge Bruce E. Reinhart for a Report and Recommendation on any dispositive matters. Judge Reinhart issued a Report and Recommendation on February 3, 2020. DE 29. Each party filed objections to the Report and Recommendation (DE 37, 38), a response (DE 41, 42), and a reply (DE 44, 45). The Court has conducted a *de novo* review of the Report and Recommendation, the objections, and the record, and is otherwise fully advised in the premises. After careful consideration, the Court adopts in part the Report and Recommendation for the reasons that follow.

## I.    FACTS[1]

This is a contract dispute between Plaintiff Florida Power & Light Company ("FPL") and Bellsouth Telecommunications, LLC d/b/a AT&T Florida ("AT&T"). FPL is an electric utility that owns utility poles throughout Florida, and AT&T is a telecommunications provider. 2 ¶¶ 9–

---

[1] All page and paragraph citations in this section are to the Complaint (DE 1-2) unless specified otherwise.

10.  FPL and AT&T are parties to a Joint Use Agreement (the "Agreement"), pursuant to which "each party allows the other to use its utility poles for purposes of attaching facilities to distribute their respective services to customers in their overlapping service territories."  3 ¶ 13.

The Agreement provides guidelines for calculating annual rent due from each party for its use of the other's utility poles.  4 ¶ 22.  The Complaint alleges that AT&T failed to pay FPL the amount due for AT&T's use of FPL's poles in 2017, invoiced at a principal amount of $9,244,141.74 and due by April 4, 2018.  4 ¶¶ 24–26.  The Complaint further alleges that AT&T failed to pay its 2018 bill, invoiced at a principal amount of $10,532,283.79 and due by March 3, 2019.  6 ¶¶ 39–42.  On March 25, 2019, FPL sent notice to AT&T that it was terminating AT&T's rights to attach to FPL's poles based on AT&T's failure "to timely pay FPL for being attached during the 2017 and 2018 calendar years."  7 ¶¶ 48–49.  The notice deferred the effectiveness of the termination until the conclusion of the parties' mediation scheduled for May 1, 2019.  Ex. A at 2.  Finally, FPL gave notice to AT&T on December 19, 2018, that it was abandoning 5,230 of its utility poles to AT&T pursuant to the Agreement.  15 ¶¶ 81–83.  AT&T has denied that the abandonment was effective, thus creating doubt as to the ownership of the poles at issue.  15 ¶ 86.

FPL filed the Complaint on July 1, 2019.  The Complaint includes five counts: breach of contract based on the 2017 nonpayment (Count I), breach of contract based on the 2018 nonpayment (Count II), breach of contract based on AT&T's failure to remove its equipment from FPL's poles (Count III), trespass based on AT&T's failure to remove its equipment from FPL's poles (Count IV), and a claim for a declaratory judgment determining whether the December 2018 abandonment of poles was effective (Count V).

AT&T moved to dismiss the Complaint pursuant to Federal Rules of Civil Procedure

12(b)(1) and 12(b)(6). First, AT&T argues that Counts I through IV are moot because it paid the principal balance owed under the 2017 and 2018 invoices within hours of the filing of the Complaint. Second, AT&T argues that Count V is not ripe because the dispute has not been submitted to mediation as required under the Agreement. Third, AT&T argues that Counts I through IV fail to state a claim because FPL was not entitled under the Agreement to declare AT&T in default prior to the conclusion of mediation. Finally, AT&T argues that the case should be stayed pending the outcome of an ongoing proceeding between the parties before the Federal Communications Commission ("FCC").

## II.     LEGAL STANDARD

In ruling on a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction,[2] courts may consider matters outside the pleadings without converting the motion into one for summary judgment. *See* Fed. R. Civ. P. 12(d). Motions under Rule 12(b)(1) can be categorized as either "facial attacks" or "factual attacks." *Garcia v. Copenhaver, Bell & Assoc., M.D.'s, P.A.*, 104 F.3d 1256, 1260 (11th Cir. 1997) (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)). A facial attack is an assertion that the complaint fails to allege a basis for subject-matter jurisdiction, which the court resolves by looking to the complaint alone. *Id.* at 1260. A factual attack disputes "the existence of subject matter jurisdiction in fact, irrespective of the pleadings." *Id.* (quoting *Lawrence*, 919 F.2d at 1529). "If the facts necessary to sustain jurisdiction do not implicate the merits of plaintiff's cause of action, then . . . 'the trial court is free

---

[2] AT&T moved for dismissal under Rules 12(b)(1) and 12(b)(6). DE 4. The Motion requested, in the alternative, that all counts be dismissed or stayed under the doctrine of primary jurisdiction. *Id.* at 14 ("If the Court were to conclude that it has jurisdiction over any aspect of FPL's Complaint, the Court should nonetheless dismiss or stay this case under the doctrine of primary jurisdiction."). The Court concludes that it does have jurisdiction over Counts I through IV and that a stay of the case is appropriate without reaching the merits of AT&T's arguments under Rule 12(b)(6).

to weigh the evidence and satisfy itself as to the existence of its power to hear the case.'" *Id.* (quoting *Lawrence*, 919 F.2d at 1529).

### III.  DISCUSSION

**a.   Jurisdiction**

The Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2.  A moot case is one that "cannot be characterized as an active case or controversy," thus precluding the exercise of federal-court jurisdiction.  *Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health and Rehab. Servs.*, 225 F.3d 1208, 1216 (11th Cir. 2000) (quoting *Adler v. Duval Cty. Sch. Bd.*, 112 F.3d 1475, 1477 (11th Cir. 1997)).  "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *Id.* (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).  When events occurring after the filing of a complaint "create a situation in which the court can no longer give the plaintiff meaningful relief, the case is moot and must be dismissed."  *Id.* at 1217.

*Mootness*

AT&T argues that Counts I and II, based on nonpayment of the 2017 and 2018 invoices, respectively, are moot because AT&T paid the invoice amounts on July 1, 2019, hours after the filing of the Complaint.  FPL responds that the Complaint sought not only the principal amount of the invoices but also interest, specifically claiming "prejudgment interest" in the *ad damnum* clauses of Counts I and II.  Because it is undisputed that the principal amount owed has been paid, the question before the Court is whether FPL retains a legally cognizable interest in the outcome of Counts I and II.  The Court concludes that it does, and therefore Counts I and II are not moot.

4

Florida law describes prejudgment interest as "merely another element of pecuniary damages." *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So. 2d 212, 215 (Fla. 1985). In other words, it is "restitution to compensate a plaintiff for the loss of use of its money over the period of time that a plaintiff is wrongfully deprived of that money." *Zucker v. Sears Roebuck and Co.*, 589 So. 2d 454, 455 (Fla. Dist. Ct. App. 1991). Consistent with that principle, the ultimate payment of the money owed does not extinguish the injury of being wrongfully deprived of the money for some period of time, during which a plaintiff could have put the funds to productive use. *See Argonaut*, 474 So. 2d at 215 ("[T]he loss itself is a wrongful deprivation by the defendant of the plaintiff's property.").

Two cases illustrate that Florida law allows for claims of prejudgment interest, even when the principal debt has been repaid. In *Kissimmee Utility Authority v. Better Plastics, Inc.*, 526 So. 2d 46 (1988), the Supreme Court of Florida considered a case against a public utility that had overcharged a customer over a 13-year period. The utility issued a refund of the overcharge about a week before the customer sued, and the customer sought solely "interest on the overcharge amount." *Id.* at 47. The Court held that the utility was "required to pay ***prejudgment interest*** at the statutory rate in effect for each year" of the overcharge. *Id.* at 48 (emphasis added).

Further, in *Stone v. CompuServe Interactive Services, Inc.*, 804 So. 2d 383, 385 (Fla. Dist. Ct. App. 2001), two plaintiffs sued on their own behalf and that of a putative class for the defendant's late payment of a $400 rebate for customers who purchased certain computers and signed up for three years of internet services. The plaintiffs received their rebate two weeks before filing their complaint. *Id.* at 386. The District Court of Appeal reversed the trial court's grant of summary judgment to the defendant:

5

> If CompuServe's payment to the Stones was so unreasonably late that it amounted to a breach of contract, then the Stones would be entitled to interest as compensation for the loss of use of the money. A finder of fact must determine the date before which CompuServe was required to remit payment under its contract with the Stones and decide whether CompuServe breached that contractual obligation, taking into consideration the . . . payment that the Stones ultimately received. Even though the amount of any such loss is tiny in a breach of contract case, the minimal amount of damages is not a basis for dismissal.

*Id.* at 390 (internal citations omitted).

AT&T argues that Counts I and II are moot for two main reasons. First, AT&T asserts that Florida law does not recognize a standalone claim for prejudgment interest. DE 42 at 5. No authority cited by AT&T supports that proposition, and it is irreconcilable with *Kissimmee* and *Stone*. In both cases, claims solely for prejudgment interest proceeded even though the principal amount owed had been paid immediately prior to the filing of the lawsuit. And in both cases, the relief to which the plaintiffs were potentially entitled was called "prejudgment interest." *Kissimmee*, 526 So. 2d at 48; *Stone*, 804 So. 2d at 390.

AT&T argues that *Kissimmee* "involved a wholly distinguishable obligation placed on publicly regulated electric utilities to pay interest when refunding overcharges to customers." DE 42 at 7. But the Florida Supreme Court made clear that it was applying the general rule of prejudgment interest as described in *Argonaut*, not a special exception for public utilities. *See Kissimmee*, 526 So. 2d at 47 ("In light of our decision in *Argonaut*, it is unnecessary for the Public Service Commission to specifically refer to prejudgment interest in its rules to assure utility customers are fully compensated in the event of an overbilling."); *id.* at 48 ("The amount of prejudgment interest to be paid absent a controlling contractual provision has been set by the legislature.").

Second, AT&T argues that Florida law requires a judgment as a prerequisite of

6

prejudgment interest. *See* DE 42 at 5 ("FPL does not have a claim for pre*judgment* interest because it does not have a *judgment*."). In support, AT&T correctly notes that under Florida law, "a claim becomes liquidated and susceptible of prejudgment interest when a verdict has the effect of fixing damages as of a prior date." *Argonaut*, 474 So. 2d at 214 (quoting *Bergen Brunswig Corp. v. State, Dep't of Health and Rehab. Servs.*, 415 So. 2d 765, 767 (Fla. Dist. Ct. App. 1982)). Accordingly, a court may award prejudgment interest only when "a finder of fact has determined the amount of damages and defendant's liability therefor." *Id.* at 215.

However, AT&T's argument is misplaced in the context of a motion to dismiss. It is uncontroversial that a judgment which liquidates the claim is required to ultimately recover prejudgment interest. But there is ordinarily no judgment at the time a complaint is filed—obtaining a judgment is presumably the objective of the litigation. Thus, AT&T's argument that FPL must have a judgment to obtain prejudgment interest appears to be another version of its argument that Florida law does not recognize a standalone claim for prejudgment interest.

Finally, AT&T disputes the manner by which FPL calculated the interest due on the invoices. FPL's theory is that interest began accumulating on the invoices as soon as AT&T allegedly defaulted, and when AT&T paid the invoice balances, the payments were applied first to accumulated interest and then to principal, such that outstanding principal remains. DE 37 at 7–8 (citing *Vitt v. Rodriguez*, 960 So. 2d 47, 49 (Fla. Dist. Ct. App. 2007) (recognizing the common-law rule that payments on a debt are applied first to interest and then to principal)). AT&T argues that FPL could not unilaterally assess interest on the invoices at Florida's statutory rate in the absence of a contractual interest provision. This issue goes to FPL's ultimate entitlement to prejudgment interest under the Agreement and Florida law, and the Court need not decide it to

determine whether it has jurisdiction over Counts I and II.

In sum, Florida law recognizes claims for prejudgment interest based on the loss of use of funds, and FPL sought prejudgment interest in its Complaint. Because AT&T's payment of the invoice amounts did not erase FPL's alleged loss-of-use injury, FPL retains a "legally cognizable interest in the outcome" of Counts I and II such that they are not moot. *Fla. Ass'n of Rehab. Facilities, Inc*., 225 F.3d at 1216 (citation omitted). The Court does not reach the merits of FPL's claims, concluding only that the alleged injury is one for which the Court can provide "meaningful relief." *Id.* at 1217.

Finally, the Court finds that Counts III and IV are not moot for the reasons articulated in the Report and Recommendation, DE 29 at 7–8, and adopts that portion of the Report and Recommendation.

*Ripeness*

With respect to Count V, involving FPL's abandonment of poles to AT&T, AT&T argues that the claim is not ripe because it was not submitted to mediation as required under the terms of the Agreement. The Court agrees for the reasons stated in the Report and Recommendation and adopts that portion of the Report and Recommendation. DE 29 at 11. Accordingly, Count V is dismissed without prejudice.

### b. Primary Jurisdiction Doctrine

Having concluded that the Court has jurisdiction over Counts I through IV, the Court next considers AT&T's argument that the case should be stayed under the doctrine of primary jurisdiction. "Primary jurisdiction is a judicially created doctrine whereby a court of competent jurisdiction may dismiss or stay an action pending a resolution of some portion of the action[] by

an administrative agency." *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 n.3 (11th Cir. 2001) (quoting *Wagner & Brown v. ANR Pipeline Co.*, 837 F.2d 199, 201 (5th Cir. 1998)).  The doctrine "comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *United States v. Western Pac. R. Co.*, 352 U.S. 59, 64 (1956).  Primary jurisdiction "is a flexible doctrine to be applied at the discretion of the district court." *Wagner*, 837 F.2d at 201.

AT&T filed a Pole Attachment Complaint with the FCC on July 1, 2019.  DE 4-4.  It alleges, *inter alia*, that FPL charges AT&T unjust and unreasonable rates for its pole attachments in violation of 47 U.S.C. § 224(b).  FPL concedes that the "FCC will decide whether the rates charged by FPL are just and reasonable."  DE 12 at 18.  However, FPL disputes that the doctrine of primary jurisdiction applies because (1) this Court need not reach the rate issue in this case, (2) the FCC cannot grant injunctive relief, and (3) there is no risk of divergent legal interpretations by this Court and the FCC.  DE 12 at 18–20.  The Court addresses each contention in turn.

First, the issue of the reasonableness of the invoices has already been presented to the Court.  In support of its Rule 12(b)(6) argument, which the Court does not reach, AT&T asserts that it was privileged to withhold payment for invoices that were not just and reasonable, which would go to the issue of whether AT&T breached the Agreement.  This issue may be before the Court again at the summary-judgment stage, and should the case proceed to the calculation of damages, a finding by the FCC that the Agreement's rate was unreasonable would render meaningless the Court or jury's calculation of damages under the Agreement.  *See Ga. Power Co. v. Charter Commc'ns, LLC*, No. 1:11-CV-4461-MHS, 2013 WL 12247036, at *10 (N.D. Ga. May 28, 2013) ("[T]he FCC has the power to abrogate terms and conditions of pole attachment

9

agreements to ensure that they are reasonable, which in this case could include revoking any other rate the parties might intend and imposing a reasonable rate.").

Second, the applicability of the doctrine does not depend on the same relief being available in the administrative proceeding and the Court. It will frequently be the case that the remedies available in an administrative proceeding and an Article III court differ, but the doctrine requires only that "some issues" in the action be resolved by the administrative proceeding. *Western Pac. R. Co.*, 352 U.S. at 59.

Third, at this relatively early stage of litigation, it is difficult to foresee to what extent the Court and FCC may reach inconsistent conclusions on any factual or legal issues. That is all the more reason to defer to the FCC's resolution of any matters within the scope of the pending adjudication, which AT&T represents must be concluded within the next three months. DE 45 at 10; *see* DE 4-5 at 2. The issues in this case are likely to be narrowed or clarified by a ruling from the FCC, which has "special competence" with respect to this dispute. *Reiter v. Cooper*, 507 U.S. 258, 268 (1993); *Duke Energy Progress, Inc. v. Frontier Commc'ns of the Carolinas, Inc.*, No. 5:13-CV-617-FL, 2014 WL 4948112, at *4 (E.D.N.C. Sept. 25, 2014) (noting the FCC's "statutorily-mandated duty to 'regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable'") (quoting 47 U.S.C. § 224(b)(1)). Accordingly, the Court exercises its discretion to stay this case until June 30, 2020, pending resolution of the pending FCC proceeding.

## IV.   CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1. Magistrate Judge Reinhart's Report and Recommendation [DE 29] is hereby

>   **ADOPTED IN PART** with respect to the Court's jurisdiction over Counts III and IV, and with respect to Count V.

2. Defendant's Motion to Dismiss or, in the Alternative, Stay [DE 4] is **GRANTED IN PART AND DENIED IN PART**. Count V is **DISMISSED WITHOUT PREJUDICE**.

3. This case is **STAYED** until **June 30, 2020**. The parties shall jointly apprise the Court within 24 hours of the FCC's decision in the related proceeding. If no decision is reached by June 30, 2020, the parties shall submit a joint status report by **July 3, 2020**, stating the parties' positions regarding the continued appropriateness of the stay.

4. All pending deadlines are **TERMINATED**.

5. The Clerk of the Court is directed to **CLOSE THIS CASE FOR STATISTICAL PURPOSES**. This closure shall not affect the merits of any party's claim.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 11th day of March, 2020.

_____
ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to Counsel of Record